FILED

2012 Sep-27  PM 05:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| Dean Sinerius, derivatively on behalf of WALTER ENERGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> DAVID R. BEATTY, HOWARD L. CLARK, JR., JERRY W. KOLB, PATRICK A. KRIEGSHAUSER, JOSEPH B. LEONARD, GRAHAM MASCALL, BERNARD G. RETHORE, MICHAEL T. TOKARZ, KEITH CALDER, WALTER J. SCHELLER, III, and A.J. WAGNER, <br><br> Defendants, <br><br> and <br><br> WALTER ENERGY, INC. <br><br> Nominal Defendant. | Civil Action No. _____ <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

1.     Plaintiff Dean Sinerius ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, for the benefit of nominal defendant Walter Energy, Inc. ("Walter" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from April 2011 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.      According to its public filings, Walter is a leading producer and exporter of metallurgical coal for the global steel industry and also a producer of steam coal, coal bed methane gas, metallurgical coke, and other related products, with its U.S. operations headquartered in Birmingham, Alabama. Walter's common stock trades on the New York Stock Exchange ("NYSE") under the symbol: WLT.

3.      This stockholder derivative action relates to a series of breaches of fiduciary duties by Walter's Board and senior management and related internal control failures concerning Walter's 2011 coal production, pricing issues and ongoing mine safety violations. Defendants' actions led to the belated-disclosure of these ongoing issues and as a result, damaged the Company.

4.      Defendants' failures begin with the disclosure of and deficiencies contained within Walter's 1Q11 financial results. These issues would begin to be disclosed starting with the June 30, 2011, announcement that defendant Keith Calder ("Calder") would be resigning effective July 31, 2011 due to "differences of opinion concerning management philosophy." Defendant Calder's resignation occurred less than three months into his tenure as Walter's Chief Executive Officer ("CEO") and served as a warning of events to come.

5.      Shortly thereafter, on August 3, 2011, Defendants caused the Company to issue a press release announcing Walter's 2Q11 financial results.  The press release revealed, in part, 2Q11 tonnage pricing and production shortfall issues that were affirmatively concealed from the public during the quarter by the Company's Board.  The next day, August 4, 2011, the Company conducted a conference call to discuss Walter's 2Q11 results. During this call, defendant Walter J. Scheller, III ("Scheller"), Walter's newly-appointed CEO, admitted that Defendants should have earlier disclosed the details concerning Walter's 2Q11 tonnage pricing issues and production shortfalls.

6.      The market did not react favorably to defendant Scheller's mea-culpa. In response to this information, Walter's common stock price plummeted **30%**, from $110.48 per share on August 3, 2011 to $77.89 on August 4, 2011. Unfortunately, this massive decline would not represent the full impact defendant's actions would cause Walter to experience in 2011 and 2012.

7.      On September 21, 2011, defendants disclosed additional detail relating to the ongoing production problems, including the magnitude and effects of the squeeze events at Walter's largest and most productive asset, Mine No. 7 in Alabama, and the inability of the newly built "Connector Road" to accommodate high-tonnage trucks in Canada.  Defendants' announcement would lower Walter's production rates and resulting income and earnings per share for the remainder of

the year. This disclosure, through which the risks of Walter's continued production problems materialized, led to further decreases in Walter's common stock price, which has never recovered and currently trades at around $38.00 per share, down from a Relevant Period high of more than $140 per share.

8.      Accordingly, the Company has been damaged.

## JURISDICTION AND VENUE

9.      Jurisdiction is conferred by 28 U.S.C §1332.  Complete diversity exists among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court because in accordance with 28 U.S.C. §1391(a): (i) Walter maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) defendants have received

substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

12.     Plaintiff is a current shareholder of Walter and has continuously held Walter stock since June 2008.  Plaintiff is a citizen of California.

13.     Nominal defendant Walter is a Delaware corporation, with its principal executive offices at 3300 Riverchase Galleria, Ste. 1700, Birmingham, Alabama.

14.     Defendant Scheller currently serves as CEO and has been a director of Walter since September 2011. Defendant Scheller serves on the Executive Committee of the Board.  According to the Company's website:

> Mr. Scheller, 51, was appointed the Company's Chief Executive Officer in September 2011 after having served approximately eighteen months as President and Chief Operating Officer of the Company's primary subsidiary, Jim Walter Resources, Inc. He joined Walter Energy from Peabody Energy Corporation, where he served as Senior Vice President-Strategic Operations from June 2006 to June 2010. Prior to his career at Peabody, from August 2005 to June 2006, Mr. Scheller worked for CNX Gas Corporation as Vice President-Northern Appalachia Gas Operations and, prior to that, at Consol Energy where he held a number of executive and operational roles, the last of which was Vice President-Operations. Mr. Scheller holds an MBA degree from University of Pittsburgh-Joseph M. Katz Graduate School of Business, a law degree from Duquesne University and a bachelor's degree in mining engineering from West Virginia University.

On information and belief, Scheller is a citizen of Pennsylvania.

15.    Defendant Calder served as Walter's CEO from April 1, 2011 and a director of the Company from April 20, 2011, until his abrupt resignation from both positions on July 31, 2011. Upon information and believe, Calder is a citizen of Canada.

16.    Defendant Michael T. Tokarz ("Tokarz") currently serves as Chairman and Presiding Director of the Board. Defendant Tokarz serves on the Compensation and Human Resources Committee, the Nominating and Corporate Governance Committee and the Executive Committee of the Board.  According to the Company's website:

> Mr. Tokarz, 62, has served as the Company's non-executive Chairman since December 2006. Since 2002, Mr. Tokarz has been a member of the Tokarz Group, LLC, a private merchant bank. Prior to this, from 1996, Mr. Tokarz was a senior General Partner and Administrative Partner at Kohlberg Kravis Roberts & Co., a private equity firm specializing in management buyouts. Mr. Tokarz received an MBA in Finance from the University of Illinois. In 2007, Mr. Tokarz was honored by the Outstanding Directors Exchange (ODX) as an Outstanding Director of the Year.
>
> During the last five years, Mr. Tokarz has served as a director of CNO Financial Group, Inc., an insurance provider (2003-present), Dakota Growers Pasta Company, Inc., a manufacturer and marketer of dry pasta products (2004-2010), IDEX Corporation, a manufacturer of engineered specialty industrial products (1987-present), MVC Capital, Inc., a registered investment company (2004-present), Mueller Water Products, Inc., a manufacturer and marketer of water infrastructure and flow control products (2006-present), and Walter Investment Management Corp., a mortgage servicer and mortgage portfolio owner (2009-present).

On information and belief, Tokarz is a citizen of New York.

17.     Defendant David R. Beatty ("Beatty") is a current director and has served on the Board since April 2011. Defendant Beatty serves on the Compensation and Human Resources Committee and the Nominating and Corporate Governance Committee.  According to the Company's website:

> Mr. Beatty, 70, has served as the Conway Director for the Clarkson Centre for Business Ethics & Board Effectiveness and the Professor of Strategic Management at the University of Toronto's Rotman School of Management since 1997. He was the former Managing Director of the Canadian Coalition for Good Governance, is Honorary Consul to Canada for the Government of Papua New Guinea, and in 1993 was awarded the Order of the British Empire (O.B.E.). Mr. Beatty was a Nuffield Scholar at the University of Cambridge, Queens' College, UK where he obtained an M.A. in Economics.
>
> During the last five years, Mr. Beatty has served as a director of Bank of Montreal, an international retail banking, wealth management and investment banking firm (1992-present), Garbell Holdings Limited, an investment holding company (1995-2006), Inmet Mining Corporation, a Canadian-based global mining company that produces copper and zinc (2003-present), FirstService Corporation, a global diversified provider of real estate services (2001-present), Husky Injection Molding Systems, Ltd., a leading global supplier of injection molding equipment and services to the plastics industry (2004-2007) and Western Coal Corp., a producer of high quality metallurgical and compliant thermal coal (2010-2011).

On information and belief, Beatty is a citizen of Canada.

18.     Defendant Howard L. Clark ("Clark") is a current director and has served on the Board since 1995. Defendant Clark serves on the Audit Committee, the Environmental, Health and Safety Committee, the Nominating and Corporate

Governance Committee and is Chairman of the Executive Committee.  According to the Company's website:

> Mr. Clark, 68, was Vice Chairman of Barclays Capital, the investment banking division of Barclays Bank PLC, from September 2008 until June 2011. Prior to joining Barclays Capital, Mr. Clark was Vice Chairman of Lehman Brothers Inc., an international investment banking firm, from 1993 until 2008, and Chairman and Chief Executive Officer of Shearson Lehman Brothers Holding, Inc., an investment banking firm, from 1990 to 1993. Mr. Clark was previously at American Express Company, an international financial services and travel company, holding various senior executive positions, including Executive Vice President and Chief Financial Officer. Mr. Clark received an MBA from Columbia University, Graduate School of Business.
>
> During the last five years, Mr. Clark has served as a director of Mueller Water Products, Inc., a manufacturer and marketer of water infrastructure and flow control products (2006-present), United Rentals, Inc., an equipment rental company (2004-June 2012), White Mountains Insurance Group, Ltd., an international financial services and insurance holding company (1993-present), Lehman Brothers Inc., an investment banking firm (1993-2008), and Maytag Corp., a leading manufacturer of residential and commercial appliances (1986-2006).
>
> Mr. Clark was neither an executive officer nor director of Lehman Brothers Holdings Inc., the parent corporation of Lehman Brothers Inc., which filed for bankruptcy protection on September 15, 2008. On September 19, 2008, the Securities Investor Protection Corporation filed a proceeding in the U.S. District Court for the Southern District of New York placing Lehman Brothers Inc. in liquidation under the Securities Investor Protection Act ("SIPA"). On September 22, 2008, Lehman Brothers Inc. sold most of its assets to Barclays Capital, Inc. This sale had been approved by the U.S. Bankruptcy Court for the Southern District of New York in connection with the SIPA proceeding and the bankruptcy proceedings of Lehman Brothers Holdings Inc.

On information and belief, Beatty is a citizen of Connecticut.

19.     Defendant Jerry W. Kolb ("Kolb") is a current director and has served on the Board since 2003. Defendant Kolb serves on the Audit Committee and is Chairman of the Environmental, Health and Safety Committee.  According to the Company's website:

> Mr. Kolb, 76, was a general partner and the Vice Chairman of Deloitte & Touche LLP ("Deloitte") from 1986 until his retirement in 1998. Deloitte & Touche LLP (and its predecessor Deloitte Haskins & Sells) is a registered public accounting firm providing audit, consulting, financial advisory, risk management and tax services. In addition to his position as Vice Chairman, Mr. Kolb served as Chief Financial Officer of Deloitte from 1985 through 1992 and Chief Administrative Officer from 1985 through 1991. Mr. Kolb joined Deloitte in 1957. Mr. Kolb is a certified public accountant and received an MBA in Finance from DePaul University.
>
> During the last five years, Mr. Kolb has served as a director of Mueller Water Products, Inc., a manufacturer and marketer of water infrastructure and flow control products (2006-present).

On information and belief, Kolb is a citizen of Connecticut.

20.     Defendant Patrick A. Kriegshauser ("Kriegshauser") is a current director and has served on the Board since 2006. Defendant Kriegshauser is Chairman of the Audit Committee and serves on the Compensation and Human Resources Committee and the Environmental, Health and Safety Committee. According to the Company's website:

> Mr. Kriegshauser, 50, has been Executive Vice President, Chief Financial Officer and a principal owner of Sachs Electric Company, a specialty electrical and design firm, since February 2000. During 1985

to 2000, Mr. Kriegshauser served in various executive capacities for Arch Coal, Inc., a coal producer and marketer, last serving as Senior Vice President and Chief Financial Officer from 1996 through 2000. Mr. Kriegshauser is a certified public accountant and received an MBA from Southern Illinois University.

During the last five years, Mr. Kriegshauser has not served as a member of any other public company board.

On information and belief, Kolb is a citizen of Missouri.

21.    Defendant Joseph B. Leonard ("Leonard") is a current director and has served on the Board since 2009 and previously from June 2005 through April 2007. Defendant Leonard serves on the Audit Committee, the Environmental, Health and Safety Committee and the Executive Committee.  Defendant Leonard became Walter's interim CEO following Defendant Calder's July 31, 2011 resignation from that position. Defendant Leonard served as Walter's interim CEO until he was replaced by Defendant Scheller on September 12, 2011. According to the Company's website:

Mr. Leonard, 68, served as interim Chief Executive Officer of the Company from March 12, 2010 through April 1, 2011 and again from August 1, 2011 through September 11, 2011. Mr. Leonard previously served as Chairman of AirTran Holdings, Inc., an airline holding company, from 2007 until his retirement in June 2008. From 1999 through 2007, he served as Chairman and Chief Executive Officer of AirTran Holdings, Inc., with the additional title of President from 1999 through 2001. From 1993 to 1998, Mr. Leonard served in various executive positions with Allied Signal Aerospace, a diversified global technology and manufacturing leader of aerospace products, last serving as President and Chief Executive Officer of its Marketing, Sales and Service Divisions. Mr. Leonard received a B.S. in Aerospace Engineering from Auburn University.

During the last five years, Mr. Leonard has served as a director of Air Canada, a full service airline company (2008-present), and Mueller Water Products, Inc., a manufacturer and marketer of water infrastructure and flow control products (2006-present).

On information and belief, Leonard is a citizen of Florida.

22.    Defendant Graham Mascall ("Mascall") is a current director and has served on the Board since April 2011. Defendant Mascall serves on the Environmental, Health and Safety Committee.   According to the Company's website:

Mr. Mascall, 65, served as Chief Executive Officer of Ncondezi Coal Company Ltd., an exploration and development company with coal assets in Mozambique, from December 2009 to June 2011. He continues to serve as a director of Ncondezi. From 2006 to 2009, Mr. Mascall served as Chief Executive Officer of Lubel Coal (UK) Ltd., a privately held coal development company active in the Ukraine. Prior thereto, Mr. Mascall held senior executive positions with Billiton PLC and Outokumpu Metals and Resources International Ltd. and also with investment banks such as Deutsche Morgan Grenfell and Barclays. Mr. Mascall received a Masters of Engineering, Mineral Economics, from McGill University, in Montreal, Canada and a Mining Engineer degree from the Camborne School of Mines in Cornwall, UK.

During the last five years, Mr. Mascall has served as a director of Anglo Asian Mining PLC, a producer of gold in Central Asia (2006-2007); Caledon Resources PLC, a coking coal producer in the Bowen Basin of Queensland, Australia (2003-2010); Gemfields Resources PLC, a colored gemstone producer (2009-present); Katanga Mining Limited (2007-2008); London Mining PLC, an iron ore development company (2010-present); Lundin Mining Corporation, a diversified base metals mining company (2006-2007); Ncondezi Coal Company Ltd., an exploration and development company with coal assets in Mozambique (2009-present); Uramin Inc., an international uranium

mining and development company (2006-2008); and Western Coal Corp., a producer of high-quality metallurgical and compliant thermal coal (2010-2011).

On information and belief, Mascall is a citizen of the United Kingdom.

23.    Defendant Bernard G. Rethore ("Rethore") is a current director and has served on the Board since 2002. Defendant Rethore is Chairman of the Nominating and Corporate Governance Committee and serves on the Executive Committee.  According to the Company's website:

> Mr. Rethore, 70, has been Chairman of the Board, Emeritus of Flowserve Corporation, a manufacturer of pumps, valves, seals and components, since April 2000. From January 2000 to April 2000 he served as Flowserve Corporation's Chairman. He had previously served as Chairman and Chief Executive Officer of Flowserve Corporation from July 1997 through January 2000 and held the additional title of President from October 1998 to July 1999. Mr. Rethore served as Chairman of BP/IP, Inc., a supplier of fluid transfer and control systems to the power and petroleum industries, in 1997, also serving as President, Chief Executive Officer and a director from 1995 through 1997 until its merger with Flowserve. From 1989 to 1995, Mr. Rethore was with Phelps Dodge Corporation, a copper producer and metals and chemical manufacturer, holding various senior executive positions, including Senior Vice President of Phelps Dodge Corporation and President of Phelps Dodge Industries. Mr. Rethore received an MBA in Accounting from the Wharton School, University of Pennsylvania. In 2008, Mr. Rethore was honored by the Outstanding Directors Exchange (ODX) as an Outstanding Director of the Year.

> During the last five years, Mr. Rethore has served as a director of Dover Corporation, a manufacturer of a wide range of proprietary products (2001-present); Mueller Water Products, Inc., a manufacturer and marketer of water infrastructure and flow control products (2006-present); Belden, Inc., a manufacturer of signal transmission products

(1997-2012); and Maytag Corporation, a leading manufacturer of residential and commercial appliances (1994-2006).

On information and belief, Rethore is a citizen of Arizona.

24.     Defendant A.J. Wagner ("Wagner") is a current director and has served on the Board since 2007. Defendant Wagner is Chairman of the Compensation and Human Resources Committee and serves on the Audit Committee.  According to the Company's website:

> Mr. Wagner, 61, has served as President and CEO of AJ Wagner & Associates, LLC, a business consulting organization specializing in automotive, financial, lending and insurance advisory services since 2007. From 1973 until his retirement in 2006, Mr. Wagner served in various executive capacities for Ford Motor Company, a global automotive company, culminating in his appointment as President of Ford Motor Credit North America and Vice President of Ford Motor Company. Mr. Wagner received an MBA from the University of Detroit.
>
> During the last five years, Mr. Wagner served as a director of Lithia Motors, Inc., an automotive company (2008-2009).

On information and belief, Wagner is a citizen of Michigan.

25.     Collectively, defendants Calder, Scheller, Tokarz, Beatty, Clark, Kolb, Kriegshauser, Leonard, Mascall, Rethore and Wagner shall be referred to herein as "Defendants."  Nominal Defendant Walter is specifically excluded from this defined group.

26.     Collectively, defendants Clark, Kolb, Kriegshauser and Wagner shall be referred to as the "Audit Committee Defendants."

## DEFENDANTS' DUTIES

27.    By reason of their positions as officers, directors, and/or fiduciaries of Walter and because of their ability to control the business and corporate affairs of Walter, Defendants owed Walter and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Walter in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Walter and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Walter and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.    Defendants, because of their positions of control and authority as directors and/or officers of Walter, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Walter, each of the Defendants had knowledge of material non-public information regarding the Company.

29.     To discharge their duties, the officers and directors of Walter were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Walter were required to, among other things:

> a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and
>
> c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

30.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

> a.  Review significant financial reporting issues and judgments made by management in connection with the preparation of the Company's financial statements;
>
> b.  Review with management the financial statements to be included in the Company's Quarterly Reports;
>
> c.  Evaluate whether management is properly and adequately emphasizing the importance of internal control measures; and
>
> d.  Respond to and oversee corrective action in connection with reports by executive officers of deficiencies in the design or

operation of internal controls or fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;

31.     The Audit Committee Defendants, in particular, and each of the Board members in general carry a duty to ensure accurate, timely disclosure of material information to the public.  These rules are outlined by the SEC in Regulation S-K, which requires that every Form 10-Q filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" (commonly referred to as "MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §§ 229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and other users to assess the financial condition and results of operations of a company, with particular emphasis on that company's prospects for the future.

32.     Regulation S-K requires that the MD&A section of a company's filings with the SEC (*i.e.*, Forms 10-Q and 10-K) among other things:

> a.  **Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.** In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> b.  **Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.** If the registrant knows of

events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. §§ 229.303.

33.    Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on **material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."**

## BACKGROUND

34.    On April 1, 2011, Walter completed the acquisition of all the outstanding common shares of Western Coal, which owned metallurgical coal mines in Northeast British Columbia, Canada; metallurgical coal and compliant thermal coal mines in West Virginia; and anthracite coal mines in South Wales, United Kingdom. That same day, defendant Calder, Western Coal's President and CEO, became the CEO of Walter.

35.    Walter's primary business, the mining and exporting of metallurgical coal for the steel industry, is conducted via two business segments: its U.S. Operations segment and its Canadian and U.K. Operations segment. The Company utilizes both underground and surface mining methodologies. During 2011,

- 17 -

underground mining accounted for approximately 60% of Walter's coal production, with surface mining accounting for the remaining 40%.

## SUBSTANTIVE ALLEGATIONS

### A. 1Q11 Financial Results

36.    On April 20, 2011, Defendants caused the Company to issue a press release announcing its financial results for 1Q11, ended March 31, 2011. For the quarter, the Company reported earnings of $81.8 million, or $1.53 per diluted common share. This release stated, in part, the following:

Underground Mining

The underground mining segment reported revenues of $343.2 million in the first quarter 2011, compared to $240.3 million in the prior-year period. Operating income was $123.9 million, nearly double the operating income in the same period last year. Revenues and operating income were higher primarily due to significantly higher average coking coal contract pricing, partially offset by lower coal sales volumes. Operating income was also negatively impacted by higher production costs, royalties and freight costs.

Coking coal sales totaled 1.7 million tons in the first quarter, down 6.4 percent compared to the prior-year period due to lower production volumes despite strong customer demand. The average selling price in the quarter was $193.51 per short ton FOB Port, a 52.3 percent increase over the average selling price of $127.05 per ton for the same period last year.

The Company produced 1.6 million tons of coking coal in the quarter, compared to 1.7 million tons in the first quarter 2010. Lower production was primarily the result of challenging mining conditions, which persisted longer than expected in the first quarter 2011. Production costs for the quarter averaged $69.20 per ton compared to $58.19 in the prior-year period. Cost per ton increased due to the

effect of lower volumes as well as planned continuous miner development associated with the preparation of future longwall panels.

The Company's natural gas business sold 3.4 billion cubic feet of gas at an average price of $4.09 per thousand cubic feet in the first quarter 2011 compared to 1.4 billion cubic feet at an average price of $5.49 per thousand cubic feet in the prior-year period. Increased production and sales for the quarter resulted from the May 2010 acquisition of the Walter Black Warrior Basin natural gas business.

Surface Mining

The surface mining segment reported revenues of $40.8 million for the first quarter 2011, compared to $31.3 million in the prior-year period on increased sales volumes and pricing. Operating income for the surface mining segment was $6.7 million, compared to $7.3 million in the prior-year period. Operating income was lower as higher revenues were more than offset by increases in production costs, primarily due to higher stripping ratios and diesel prices.

The surface mining segment reported coal sales of 426,000 tons during the first quarter, up 13.6 percent compared to the prior-year period primarily due to incremental sales volumes from the Reid School metallurgical coal mine. Production was 369,000 tons, up 7.0 percent versus the first quarter last year driven by the incremental Reid School mine tonnage.

Walter Coke

Walter Coke reported revenues of $47.3 million in the first quarter 2011, compared to $51.2 million in the prior-year period. Revenues were lower as a result of lower sales volumes, which more than offset increased pricing. The segment generated $8.0 million in operating income in the quarter, compared to $7.6 million in the prior-year period. Operating income improvements were the result of strong pricing and improved plant performance.

The segment sold 104,000 tons of metallurgical coke in the first quarter 2011 at an average price of $409.85 per ton compared to

139,000 tons sold in the prior-year period at an average price of $327.37 per ton. Price increases were primarily attributable to improved demand in the domestic automotive and steel markets.

2011 Full-Year Business Outlook

As previously announced, Walter Energy acquired Western Coal on April 1, 2011. Sales volume expectations for both legacy Walter Energy and legacy Western Coal are as follows:

The Company expects full year metallurgical coal sales from the Walter Energy Alabama underground operations of 7.5 million to 8.0 million short tons. In addition, the Walter Energy Alabama surface operations expect to sell between 1.4 million and 1.6 million short tons of thermal coal for the full year.

From the legacy Western Coal operations, the Company expects metallurgical coal sales of between 4.9 million and 5.3 million metric tons for the period of April 1, 2011 to Dec. 31, 2011. The Company expects thermal coal sales of 1.0 million to 1.2 million metric tons for the same period from these operations.

37.    Walter's earnings for 1Q11 were nearly double the earnings it reported during the first quarter of the prior year. Defendant Calder commented on the Company's impressive earnings results, stating, in pertinent part, that Walter's revenue and income were driven by high coal prices:

We generated strong year-over-year growth in revenues and income driven primarily by the third highest coking coal pricing we have ever achieved. . . Now that our acquisition of Western Coal is complete, we can turn our attention to delivering on our promises, executing integration activities and framing future growth opportunities.

**B. <u>April 21, 2011 Conference Call</u>**

38.     Following Defendants' 1Q11 earnings announcement, on April 21, 2011, Defendants hosted a conference call for analysts and investors to discuss the Company's earnings and prospects.

39.     Prior to the call, Defendants provided investors with financial information about the Company, which included the following charts which describe Walter's recent operating performance, sales, pricing and production. These charts were filed with the SEC on Form 8-K on April 25, 2011:

 Q1-2011 Financial Summary
Underground Mining

| In millions USD unless otherwise noted | Q1 2011 | Q1 2010 | % Change |
|---|---|---|---|
| Revenue | $343.2 | $240.3 | +42.8% |
| Operating Income | $123.9 | $64.8 | +91.2% |
| % Op Margin | 36.1% | 27.0% | +33.7% |
| Capital Expenditures | $37.5 | $12.7 | +195.3% |
| Sales (tons in millions) | 1.7 | 1.8 | -6.4% |
| Average Sales Price per Ton | $193.51 | $127.05 | +52.3% |
| Production (tons in millions) | 1.6 | 1.7 | -5.9% |
| Average Mine Production Cost per Ton | $69.20 | $58.19 | +18.9% |

First Quarter 2011 Earnings Conference Call | 4/21/11 | 13

* * *



## Q1-2011 Business Summary
## Surface Mining

| In millions USD unless otherwise noted | Q1 2011 | Q1 2010 | % Change |
|---|---|---|---|
| Revenues | $ 40.8 | $ 31.3 | +30.4% |
| Operating Income | $ 6.7 | $ 7.3 | -8.2% |
| % Op Margin | 16.4% | 23.3% | -29.7% |
| Sales (tons in 000s) | 426 | 375 | +13.6% |
| Average Sales Price per Ton | $ 92.75 | $ 78.89 | +17.6% |
| Production (tons in 000s) | 369 | 345 | + 6.8% |
| Average Production Cost per Ton | $ 69.01 | $ 58.32 | +18.3% |

First Quarter 2011 Earnings Conference Call  |  4/21/11 | 15



## Q1-2011 Business Summary
## Walter Coke

| In millions USD unless otherwise noted | Q1 2011 | Q1 2010 | % Change |
|---|---|---|---|
| Revenue | $47.3 | $51.2 | -7.6% |
| Operating Income | $8.0 | $7.6 | +5.3% |
| % Op Margin | 16.9% | 14.8% | +14.2% |
| Sales (tons in 000s) | 104 | 139 | -25.2% |
| Average Sales Price per Ton | $409.85 | $327.37 | +25.2% |
| Production (tons in 000s) | 99.4 | 82.0 | +21.2% |

First Quarter 2011 Earnings Conference Call  |  4/21/11 | 16

40.     These charts highlight the drivers behind Walter's 1Q11 performance increases.  Namely, increases in sales prices from 1Q10 to 1Q12: (i) +25.2% for Walter Coke; (ii) +17.6% surface mining: and (iii) +52.3% for underground mining.  These metrics are telling because production clearly did not drive the increased EPS since production actually decreased by .1 million tons (or 5.9%) over the same period.

41.     Also during the April 21, 2011 conference call, Defendant Scheller noted that carryover tonnage from the 2010 fourth quarter adversely impacted the average price at which Walter sold coal during 1Q11, stating, in pertinent part:

> Sales volumes of 1.8 million tons for Q1 were down 6.4% compared to the same period last year. The lower sales volume reflects lower production and inventory levels. Our average coal sales price at the underground segment in the quarter was $194 a ton, up 52% over the same quarter last year. **Benchmark prices in the first quarter of 2011 were higher than those in the first quarter of 2010 and we sold carryover tonnage from the previous year in the first quarter which somewhat reduced the increase and average sales price and percentage increase**.

42.     Defendant Calder indicated that coal "pricing is very strong" and that Walter had "settled" its contracts at coal prices that were nearly 50% higher than those during 1Q11, stating, in pertinent part:

> **Looking at the current quarter, second quarter 2011, hard coking coal prices, we settled in line with markets -- $326 to $330 per ton, which is a reflection of the high quality coal we are producing. This increase is nearly 50% higher than the previous quarter.**

With regard to the low-vol PCI coal we produce in northeastern British Columbia, **Q2 prices have been in the area of $275 per ton, which represents 83% of the hard coking coal settlement. This is the high end of historic ratio levels.** In short, worldwide demand for metallurgical coal remains strong throughout January and March and the longer term outlook is firm and as the economic recovery continues in developed economies and expands in the major growth regions of China, India and Brazil. **Q2 pricing is very strong and we continue to see exceptional interest in a demand for all of our coal products.**

43.     During the question and answer session of the conference call, Defendant Calder reiterated that the pricing and demand for coking and metallurgical coal was strong, stating, in pertinent part:

Just to add a little to that, **it does mean that coke pricing is attractive right now**, and we are getting more opportunities to diversify our customer base if it is attractive to us financially. And that was demonstrated -- I think it's been announced. We placed two shipments of coke overseas in the last quarter. **So coke side of the business is very healthy and similar to the coking coal, the metallurgical side of things, there is strong demand going forward**.

44.     Defendant Calder further explained that:

Walter's coal sales "tend to lean toward the higher end of the benchmark pricing range" when it enters into sales contracts, and that Walter's coal production was "priced and sold" through 2Q11, with a vast majority of its sold coal being priced in the month immediately preceding a given quarter (*i.e.*, the pricing for 2Q11 was established in March 2011):

Jim Rollyson - Raymond James, Analyst:

That's very helpful and Keith maybe you can provide a little color across the spectrum of the combined companies now for where your contract position was. I think in the last quarter you were pretty well

sold for the first half at the Walter operations, some of that because of carryover coal that bled into this year. **But maybe a little color on how to -- where the second quarter, the rest of the year is from a contract standpoint and a pricing standpoint and what is open on the Western side as well**.

Defendant Calder:

**The scenario for both old Walter and old Western is very similar. That is that obviously through the second quarter, our production is priced and sold.** As we go into the second half of the year, all of the materials committed going forward, but only 10% is priced. So we're about 90% open on pricing going forward and I think it really just demonstrates the commonality or the philosophical approach of how we see marketing, both before the integration of the two companies and now going forward.

Jim Rollyson - Raymond James, Analyst:

When we think about pricing metals, particularly on the met side, for Q2, do you think of that somewhere bridging the gap between where pricing was in Q1 and previously where the bench marks have been set somewhere in the middle, maybe?

Defendant Calder:

That's a very good way of looking at it. Because as you know we did sell some material both from the old Western and legacy Walter board for half the year. So some of that will be a little carryover in both areas coming out of Alabama. So that's a good way of looking at it. It's sort of a combination of middle ground between the two.

Jim Rollyson - Raymond James, Analyst:

And just a last one –

Defendant Calder:

One thing I think is important to note -- sorry for interrupting but just to finish that. **It is important to note that all of our products tend**

**to lean toward the higher end of the benchmark pricing range whenever we place those contracts - just a reflection of the high quality of the product that we sell.**

* * *

Lucas Pipes - Brean Murray, Analyst:

That's fair. As a follow up, as you mentioned, you still have to price a good amount of coal in the second half of the year. Could you tell us about when you want to price these volumes? Are you trying to get them out now? The pushback from your customers -- how are they seeing things? Are they trying to maybe hold off a little bit and then price more in the second half of the year? What is your strategy there?

Defendant Calder:

Well, I think it's important to note that **Walter Energy is first and foremost a seaborne met coal producer so we sit well in the seaborne met coal pricing mechanisms. The bulk of that, vast majority is done on a quarterly basis -- so pricing for Q3 would be executed in June. So that pricing would be established in June. The pricing for the following quarter, obviously in the last month of the third quarter. There are -- sometimes we find there's an opportunity and a desire on the part of our customers to establish a six monthly contract or nine monthly contract, we do that occasionally.** But first and foremost and overall, because we are a seaborne met coal producer we are for the most part in the quarterly pricing stage.

Now, on the other hand, **we do have long-term contracts with the vast majority of our customers. And that means that the volumes are contracted two and three and four years out. So we know where our volumes are going for Q2 and Q3**. It is now a question of defining that price and hence the seaborne bench mark is what we work on.

* * *

- 26 -

Mitesh Thakkar - FBR Capital Markets, Analyst:

Will stay about the same. Okay. And one final question. And this is just in general, about the pricing side. I know you talked about a strategy going forward on the quarterly and -- you know, on a case by case basis, maybe a six-month contract but will you follow the same strategy in terms of your low-vol PCI side?

Defendant Calder:

Low-vol PCI -- this is Keith speaking again -- **low-vol PCI also trades on a seaborne market and it trades exactly the same way. It is quarterly pricing, the bulk of it. Last month in the quarter is when we establish the pricing for the next quarter**. But the totality of our production is all long-term contracts to well established customers on a multi-year basis. So volumes and long-term contracts, pricing on a quarterly basis, with some exceptions.

## C.  **1Q11 Form 10-Q**

45.    As shares of Walter continued to trade at artificially inflated levels, on May 9, 2011, Defendants filed with the SEC the Company's 1Q11 Form 10-Q, for the fiscal quarter ended March 31, 2011, signed and certified by Defendant Calder. In addition to making statements concerning the Company operations, including revenues, expenses, costs, and ratios, as had been published previously, the 1Q11 Form 10-Q also provided statements that attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

**Item 4. Controls and Procedures**

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

An evaluation was performed under the supervision and with the participation of our management, including our principal executive

officer and our principal financial officer, of the effectiveness of our disclosure controls and procedures as such term is defined in Rule 13a-15(e) under the Securities Exchange Act of 1934 as amended ("Exchange Act") as of the end of the period covered by this quarterly report on Form 10-Q. Based on that evaluation, our management, including our principal executive officer and principal financial officer, concluded that our disclosure controls and procedures were effective as of March 31, 2011 to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (2) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.

46.   The Company's 1Q11 Form 10-Q also contained representations concerning safety conditions at Walter mines:

**Item 5.   Other Information**

**Mine Safety and Health Administration Safety Data**

The Company is committed to the safety of its employees and to achieving a goal of providing a workplace that is incident free. In achieving this goal the Company has in place health and safety programs that include regulatory-based training, accident prevention, workplace inspection, emergency preparedness response, accident investigations and program auditing. These programs are designed to comply with regulatory mining-related coking coal safety and environmental standards. Additionally, the programs provide a basis for promoting a best in industry safety practice.

47.   In addition to the foregoing, the Company's 1Q11 Form l0-Q also contained a certification by Defendant Calder that attested to the purported

accuracy and completeness of the Company's financial and operational reports, as follows:

1. I have reviewed this quarterly report on Form 10-Q of Walter Energy, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

48.    The statements made by Defendants and contained in the April 20, 2011 release, the April 21, 2011 conference call, and in the Company's 1Q11 Form 10-Q were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others, because each statement failed to disclose that Walter had committed to sell more than 706,000 tons of coal during 2Q11 at prices

that were well below the 2Q11 benchmark price.  The 706,000 tons of coal represents an amount exceeding **30%** of the coal that Walter sold during all of 1Q11 at prices **30% less** than the $326 to $330 per ton 2Q11 benchmark price that Defendants led investors to believe Walter's contracts would be settled at during 2Q11.  This knowledge was confirmed by Defendant Calder on the April 21 conference call wherein he stated the "[l]ast month in the quarter is when we establish the pricing for the next quarter" and "obviously through the second quarter, our production is priced and sold." Accordingly, Defendants' concurrent statements confirm that Walter's 2Q11 coal sales had been "priced and sold" by no later than March 2011 and that, as a result of the Company's commitment to sell a significant amount of coal at substantially lower prices, Walter's 2Q11 earnings would be adversely affected.  Similarly, the representations in the 1Q11 Form 10-Q confirming effective disclosure controls were false and misleading as such controls were either not in place or were disregarded allowing the Company to issue reported financial statements that were not true, accurate, or reliable.

### D. Production Issues & Related Safety Violations at U.S. Operations

49.     A substantial portion of the April 21 conference call discussed the coal production rates at Walter, both at the Company's U.S. operations (Mine Nos. 4 and 7) and its Canadian operations.  Mine No. 7 is Walter's flagship coal mine.  Highlighting its importance to Walter's operations, the Company's 2010 Form 10-

K filed with the SEC on February 28, 2011 (the "2010 Form 10-K") states that Mine No. 7 is the largest producer of low-volatility metallurgical coal in the United States and that it accounted for more than **47% of the Company's entire coal production** during 2010.  As such, Mine No. 7 is closely followed by analysts and the market as a whole.

50.     Defendants included a chart in the presentation materials describing the 10.9% gain at Mine No. 7 and utilized the conference call to explain the negative 25.7% change at Mine No. 4.  Defendant Scheller's comments are self-explanatory:

> Average production cost for the underground mining segment was $69 per ton, a 19% increase over last year. The higher costs primarily were due to higher labor costs as we increased manpower to run more continuous miner sections and also resulted from reduced production volumes as a result of weak roof conditions, ventilation and construction projects, and a two week squeeze on the lower wall at the number four mine in January.
>
> * * *
>
> Mine four production was impacted in Q1 by a couple of issues. The ventilation and construction issues were due to delayed completion of a new ventilation shaft which encountered several disturb zones due to sub surface faulting which has caused considerable delay.
>
> Moving on to the quarterly coking coal production volumes on slide 14, **we are positioned to expand production for an 8 million ton annual run rate as we move forward**. We had two long wall moves and produced 1.6 million tons in the first quarter, which was 4.6% less than the same period a year ago. **This quarter's long wall moves and improved continuous miner advance rates establish a foundation to moving forward at production [sic] at improved rates**.

* * *

**At mine 7, the number one long wall had had difficult cutting conditions which required reduced cutting rates and increased maintenance to keep tools adequate for the task. These conditions impacted both Q4 and Q1.**

[W]e posted strong financial results for the quarter, with net income and earnings per share almost doubled compared to the first quarter last year, and an EBITDA increase of 58% compared to last year. **We remain on track with our production profile with our first quarter run rate on pace for record production at our [No. 7] mine.**

51.    Defendant Calder also announced Walter's 2011 expected coal sales, stating, in pertinent part:

For 2011 the Company expects full year met coal sales from our Alabama underground operations of 7.5 to 8 million short tons including up to 500,000 tons of purchase coal. In addition the Alabama surface operation is expected to sell between 1.4 and 1.6 million short tons of thermal coal for the full year. From the legacy Western Coal operations, the Company expects metallurgical coal sales of between 4.9 million and 5.3 million metric tons for the period of April 1st to December 31st, 2011. The Company expects thermal coal sales of 1 million to 1.2 million metric tons for the same period from our operations.

52.    During the Q&A session call, Defendants were specifically asked about any ongoing geology problems Walter might be experiencing.   Defendant Scheller responded that the Company's production issues were "well in hand" and "behind us" and that investors would see improvement going forward, stating, in pertinent part:

<u>Jim Rollyson - Raymond James, Analyst:</u>

Keith or maybe Walt.

**On the Walter underground operations, it sounds like you are maybe getting past some of the geology issues you've had that have been ongoing for the last couple of quarters.** I want to get your thought on, [(a)], **is that a correct assessment** and [(b)] do you still feel good about heading towards that 9 million tons type of number as we head into 2012 at this point?

<u>Defendant Calder:</u>

I will head [sic] that over to Walt. I think he is well positioned to answer that.

<u>Defendant Scheller:</u>

We are definitely still playing [sic] the move towards that 9 million tons rate. In exactly what quarter that will occur or when we will hit that full rate, I'm not exactly sure whether it will be -- you know, the 4th quarter of 2012 or the 1st quarter of 2013 but we certainly intend to get there. **The production issues we've had, I believe we have them well in hand.** Some of those issues – for instance, the N19 panel was simply working our way through some very difficult geology in a panel once we got started. So I'm confident that **we are putting these issues behind us and that we will see improvement as we roll forward.**

53.     Defendant Scheller doubled down on his prior response that the Company took action to alleviate issues it had encountered that impaired its coal production, stating, in pertinent part:

<u>Shneur Gershuni – UBS, Analyst:</u>

Thank you for that clarification. I was wondering if Walt could give us a little color as to the change or the issues that we saw -- you know at that point in the first quarter continuing and expand? Or are we

going to get to the point where the second quarter will look like the whatever is the baseline quarter of what the mine should actually operate like and how we should be modeling that on a going forward basis when we talk about 2012 and 2013.

Defendant Scheller:

I think we will see the second quarter -- **performance in the second quarter start to be much more indicative of what we should expect moving forward**.
We need to remember, we still have several long wall moves toward the end of the year this year. But the problems which we encountered, again, were some of the more located -- at our mine 4, at the long wall panel. So we have moved out of that area of the mine and are now operating actually a few miles away from there. **So we don't anticipate having those same issues. And the problems we were encountering on the -- on both long walls with ventilation, we believe we have made adjustments and changes to equipment and done things to help to alleviate that problem. And we should be able to operate in a more productive mode as we move forward**.

54.    At the same time that Defendants were making the above positive statements about Walter's coal production, they knew or recklessly disregarded that Mine No. 7 was experiencing ongoing squeeze events and mine ventilation problems, which caused the mine to undergo repeated shutdowns in production.[1] During early 2011, squeeze events caused the East longwall of Mine No. 7 to experience numerous shutdowns in production. These shutdowns occurred repeatedly, sometimes lasting days, weeks, and, at one point, almost an entire

---

[1] Generally, a squeeze event is a condition where the weight of the strata surrounding a mine causes the mine roof or walls to squeeze into the mine, thereby diminishing the mine's integrity, making the mine unsafe and delaying production activities.

month, and are contrary to Defendant Scheller's comments minimizing the effects of these ongoing issues on the April 2011 conference call.

55.     Moreover, Walter had been repeatedly sanctioned by the Mine Safety and Health Administration ("MSHA") for unsafe roof and ventilation conditions at Mine No. 7. Between January 1, 2011 through April 21, 2011 alone, Walter received eight roof-related MSHA citations on Mine No. 7, five of which were designated as being "significant and substantial," for violations associated with existing hazards related to "falls" of the roof and coal or rock bursts. During this same short time period, MSHA issued 14 ventilation-related MSHA citations on Mine No. 7, five of which were designated as being significant and substantial.

56.     Regarding the roof-related violations that MSHA inspectors found in Mine No. 7, the MSHA noted the following in its reports to the Company:

April 21, 2011: "Standard 75.220(a)(1) [governing roof control plans] was cited *26 times* in two years at mine 0101401 [Mine No. 7] (26 to the operator, 0 to the contractor)."

February 19, 2011: "The mine roof where persons work or travel was not being supported or otherwise controlled to protect a person from a fall of the roof on the outby corner" and "[t]his condition in this area, if allowed to exist, is reasonably likely to cause permanently disabling injuries. The mine has been cited 20 times in 2 years. This mine has experienced a fatal injury from falling rock."

January 4, 2011: "An area of unsupported roof was found adjacent to the travel way at the end of the track on the No. 2 longwall section. This area measured approximately 6'6" by 6'8" and has a slab of rock approximately 10" thick beginning to break loose from the top.

Standard 75.202(a) was cited 18 times in two years at mine 0101401 (18 to the operator, 0 to the contractor)."

**E. Production Issues at Canadian Operations**

57.     The Company's April 1, 2011 acquisition of Western Coal added operations in Canada, West Virginia and the U.K. to Walter's portfolio. In the April conference call, Defendants highlighted the productivity gains resulting from a "Connector Road" built between two Canadian mines—Willow Creek and Brule. This "Connector Road" would decrease the distance coal mined at Brule would need to travel to a processing facility, thereby leading to increased production and decreased costs. The following chart from the April conference call summarizes this information:



Re-opening and Expanding Willow Creek

- Successful start-up
- Permits expected soon to get to 1.7 million metric ton per year run-rate
- Falling Creek Connector Road in service
- Major investment underway



Willow Creek mine site



Willow Creek plant site

First Quarter 2011 Earnings Conference Call | 4/21/11 | 21

58.    Notably, the above chart claims that the "Connector Road" is "in service" as of April 21, 2011 (the conference call date).   In truth, while the "Connector Road" did reduce the hauling distance by 25 miles, from just over 62 miles to 37 miles, Defendants knew or recklessly disregarded that, because of its very steep corners and turns, the "Connector Road" could not accommodate the large 110-ton trucks with 55-ton trailers that Walter had planned to use to haul Brule mine coal. As a result, Walter was forced to use smaller trucks to haul Brule mine coal, which minimized the benefits associated with the "Connector Road's" shorter hauling distance, including any increase in the volume of coal Walter could produce from its Brule mine. In addition, Defendants admit in Walter's 2011 Form 10-K filed with the SEC on or about February 29, 2012, that the "Connector Road" project was not substantially commissioned until the end of Company's 3Q11, stating, in pertinent part:

> **Our Falling Creek connector road project was substantially commissioned near the end of the 2011 third quarter** and truck hauling volumes on the road have continued to increase into the 2012 first quarter. The road connects the Brule mine to the Willow Creek mine where Brule's coal is processed and loaded at the rail load out facility. The new road reduces the hauling distance as compared to the previous route from just over 62 miles down to 37 miles.

### F. Defendant Calder's June 30, 2011 Resignation

59.    On June 30, 2011, Defendants caused Walter to issue a press release announcing the resignation of Defendant Calder as Walter's CEO and "promoting"

Defendant Leonard as his replacement in such capacity on an interim basis:

> Walter Energy (NYSE: WLT) (TSX: WLT), the world's leading, publicly traded "pure play" producer of metallurgical coal for the global steel industry, announced today that Keith Calder has tendered his resignation as Chief Executive Officer and a director, effective July 31, 2011. The Board has named Board member Joseph B. Leonard to succeed Mr. Calder as Interim Chief Executive Officer at that time.

> Mr. Leonard served as Walter Energy's Interim Chief Executive Officer from March 2010 through March 2011. The Board has engaged Spencer Stuart to initiate a search, within Walter Energy and externally, for a permanent Chief Executive Officer.

> **Mr. Calder informed the Board in his letter of resignation that he is resigning due to differences of opinion concerning management philosophy.** Said Mr. Calder, "I do believe Walter Energy has immense potential and I am sure it will be realized. That said, it is now time for me to move on and pursue other interests."

> Michael T. Tokarz, the non-executive Chairman of the Board, said, "We accept Keith's decision to resign and appreciate his desire to move on. We thank him for helping us through the transition and integration of Walter Energy and Western Coal into one company -- the new Walter Energy. Most important, we are confident that the company, under the direction of Joe Leonard, will continue its current momentum."

123. On July 5, 2011, Walter filed a Form 8-K with the SEC announcing that, as previously disclosed in a Form 8-K that the Company filed with the SEC on February 4, 2011, Walter's Senior Vice President and Interim CFO Honnold, resigned from the Company effective as of the close of business on June 30, 2011.

## The Truth Begins to Emerge

**A. 2Q11 Financial Results**

60.    On August 3, 2011, Defendants caused a press release to be issued announcing the operating results for its 2Q11, the period ended June 30, 2011. For the quarter, the Company reported net income of $107.4 million, or $1.71 per diluted common share. These results were significantly lower than Wall Street estimates, which were based upon the bullish April 2011 misrepresentations and omissions discussed herein above. In the August 3, 2011 press release, Defendant Leonard, commented on the results, stating, that "difficult geology in Alabama" adversely affected the Company's production and sales results:

> Walter Energy continues to execute on its long-term strategic plan to grow its met coal production base, highlighted by the acquisition of Western in April and our execution of lease agreements on 68 million metric tons of Blue Creek coal reserves in May. Those initiatives are beginning to show positive results as we increased met coal sales to a record 2.7 million metric tons in the quarter, and we expect to grow total met coal sales volumes by an additional 50 percent by the end of 2013. In addition, we have further organic and bolt-on growth opportunities in our pipeline to continue increasing and diversifying our metallurgical coal production footprint over the course of this decade to carry on our outstanding track record of creating value for our shareholders.
>
> **During the quarter, we experienced difficult geology in Alabama and weather-related challenges at both our Alabama and Northeast British Columbia operations, which adversely affected production and sales results.**

> **We are putting these production issues behind us and expect to finish 2011 with second half met coal sales of approximately 5.9 million metric tons.**

## B. August 4, 2011 Conference Call

61.    The next day on August 4, 2011, following the Company's fiscal second quarter earnings announcement, Defendants hosted a conference call for investors and securities analysts. In addition, Defendants provided investors and analysts with updated material indicating, among other things, that Mine No. 7 was continuing to experience ventilation issues and squeeze conditions.  In contrast to the Company's August 3, 2011 press release, Defendant Scheller represented that squeeze conditions at Mine No. 7, which began in April 2011 (but were first disclosed in August, 2011), were the primary cause of the decline in Walter's coal production during the quarter, stating, in pertinent part:

> We had a couple issues that negatively impacted production this quarter. **First, and most significantly**, **we had two squeezes at the East long wall at the Number 7 Mine**. Typically in long wall mining, the shield supports the immediate roof. The shield advances as we extract the coal in the panel allowing the roof to fall safely behind the shield.
>
> However, at Mine Number 7, **beginning in April**, we encountered a massive section of sandstone above the immediate roof. The long wall shields we have on that panel are rated to 950 tons of support capacity. When the sandstone failed to brake, as expected, its effective weight increased to a point where it exceeded the working capacity of the shields.
>
> This additional load caused the shields to compress to their minimum height interrupting long wall production. The process to free the

squeezed shield is difficult and time-consuming. As a result, we've made a number of changes to mining techniques and equipment.

And, we believe these changes give us the best chance to succeed as we continue in this panel and we have recently seen advance rates return to improved levels. These shields were scheduled for replacement at the end of this long wall panel, and new shields have recently arrived to replace the set as planned. However, if we encounter further geological events, we will put these new shields into service early. These shields are rated to 1,350 tons of capacity, and we have similar equipment installed on our other two long walls. These have been operating without issue for some time.

62.     Defendant Scheller's comments effectively acknowledged that the squeeze events that occurred throughout the quarter (which disclosure of such was withheld from investors), were the main cause of the production shortfall at Mine No. 7 when he conceded that Walter lost only "a couple" of days of production due to the tornados that hit Alabama during the quarter, stating, in pertinent part:

We also have experienced some impacts from the April 27 tornadoes in Alabama. Although, most of our facilities were spared the worst of the damage, **we did lose a couple days of production due to power outages** in the area and struggled to mine at capacity due to the impacts on our employees and the community.

63.     Defendants also disclosed the poor results at Walter's Canadian facilities, but downplayed the impact on the Company's results of the inadequacy of the Connector Road to handle large transport vehicles, the lack of permits at the Willow Creek facility and the fact that the Connector Road project was not yet "substantially commissioned" as had been previously stated to the public in the April 2011 conference call.

- 42 -

64.     Defendants also admitted that a significant portion of the Company's 2Q11 coal sales were made at prices well below the 2Q11 benchmark prices that Defendants had previously disclosed in April, stating, in pertinent part:

David Lipschitz - Credit Agricole Securities, Analyst:

Yes. And then my next question is the realization in the second quarter was relatively low, obviously, compared to benchmark, and I know you had some carry over tons. But the last quarter, you talked about signing deals of 330 and 275 for PCI and things like that. So, just wondering, then you only have carryover at 270 and 260. I was just wondering what happened. Did you have to take discounts for the benchmark, or what happened that your prices are well below what the benchmarks are, even in the carryover from second to third quarter?

Mike Madden – Walter Energy Inc., SVP, Sales & Marketing:

Hi, David. This is Mike Madden. In Q2 we had a little over 700,000 tons of carryover which was brought forward from Q1, and as you know, the pricing in Q1 was around 225 level benchmark. And then **we had intermingled in the first 6 months of calendar year 2011, we had some 6-month deals which were booked in January, so we got the benefit of those in Q1 but we lost the benefit in Q2**.

65.     Defendant Leonard further expanded on the effects that the 2Q11 carryover tonnage would have on Walter's 3Q11 results, stating, in pertinent part:

Jim Rollyson - Raymond James & Associates, Analyst:

Okay. And, then Joe, last couple quarters you have a little bit of carryover tonnage just given some of the volume shortfalls. I presume that might be the case going into the third quarter, just wanted some color on carryover tons, pricing, and what's open for Q3 and Q4.

<u>Joseph Leonard - Walter Energy Inc., Interim CEO:</u>

I can go ahead and take that. It's -- we have 706 -- actually 600,000 tons at prices of $270 per ton carrying over from Q2 to Q3 and that's within the US. And then within the Canada UK operations, we have approximately 300,000 tons at a carryover price of approximately $260 per ton.

66.     Market analysts expressed concern over the integrity of the Company's disclosures and the adequacy of its financial controls during the August 4 call.  Mark Russo from Millennium Partners stated, in pertinent part:

I was wondering if you could help me understand a few things. I don't think anybody's asked the question. **First is if we could get a real update on what happened with [respect to Keith Calder's resignation].** The second I guess is a question for Joe [Leonard], and if there is [sic] any Board members on **how we are supposed to -- as shareholders have faith in your outlook in the business plan and financial controls when there was no update mid-quarter on anything that happened with this, when you were drastically different than what we heard on the call last time**? And how we are supposed to have faith in your outlook on the tons when you haven't hit the tons going all the way back to 2008. Thanks.

67.     Defendant Scheller responded to Mr. Russo's questions concerning the Company's failure to disclose the pricing and production issues that negatively impacted Walter's 2Q11 results:

**Yes, as far as the updates go, I think in retrospect we should have come out with a mid-quarter update. If we had, under my watch which started today, if we have misses or productions [sic], I can assure you we will do that.** You know, we've had some very tough mining conditions in both Canada and Alabama that were not predictable, so we've had to deal through that. I think if you look at our track record of shareholder value creation, we are the best in the industry. Both since 2007 and in the last 12 months. Though we have

to deal with turmoil from time to time, our track record is unsurpassed and something we are very proud of.

\* \* \*

Mark Russo - Millennium Partners, Analyst:

So, I guess going forward we should expect interim updates if there is [sic] any doubts that -- because while I understand what you're saying, outside of what happened with Keith [Calder] and a few other people, the senior leaders of the Company have been in place for a very long time. **They did not update us on any of this at all. Which is the responsibility of the Board, and Joe, you've been involved prior to this as well.**

Walt Scheller - Walter Energy Inc., President - US Operations:

**I can assure you on my shift we will make sure that there are not any surprises as we move forward.**

68.     Mr. Scheller's comments were not well-taken by the market.  The price of Walter common stock fell approximately *30%*, from $110.48 per share on August 3, 2011 to close at $77.89 on August 4, 2011.  Securities analysts who followed Walter universally expressed alarm over the Company's results, viewing Walter's disclosures as surprising and expressing shock that Company management had not issued an update during 2Q11. For example:

BB&T Capital Markets (August 4, 2011):

WLT: ABYSMAL QUARTER; DISCLOSURE LACKING

Key Points

●   **TERRIBLE QUARTER; WORSE DISCLOSURE**.  We suspected it would be a challenging, below consensus quarter. **What**

**we got was something far worse**. Last night after the bell, WLT reported Q2 adjusted EPS of $2.36 versus our estimate of $3.90 and consensus of $3.98. EBITDA was equally poor at $276.6M (BB&T=$400.8M; consensus=$424.4M). **The miss was all over the place**, but we highlight the top line, where revenues of $773.0M compared to our forecast of $868.4M and consensus of $914.5M. Production was challenged by a myriad of issues, including geological issues in Alabama and weather-related disruptions in both Alabama and Northeast British Columbia. This affected costs, which appeared to blow out in Canada. From our vantage point, neither the geological issues nor the weather-related disruptions were shocking. **What was shocking was the magnitude of the miss**. **Moreover, the complete revamping of how WLT discloses its financial results (i.e. no more Mine No. 4 and Mine No. 7 production and cost results) was a big surprise and a major disappointment from our perspective**. We thought the company took a step backward in that regard.

● **COMPANY REDUCES 2H'11 SHIPMENT GUIDANCE**. In conjunction with the Q2 release, management also lowered 2H'11 met coal shipment guidance. Total met sales for the back half of the year are now expected to be 5.9M metric tons. We were modeling the equivalent of 7.8M metric tons.

Scotia Capital (August 4, 2011):

Q2/11 - Significant Miss Can Be Attributed to Carryover Tonnes
● Walter Energy reported adjusted Q2/11 earnings of EPS of US$2.46, well below both our estimate of US$4.21 and consensus at US$3.98/share. Reported earnings of US$1.71 per share included a number of non-recurring items, mostly related to the Western Coal acquisition which closed early in the quarter.

● **Production was below estimates**, sales volumes were in line. Walter reported production of 3.4Mt coal in the quarter, slightly below our estimate of 3.7 Mt. Sales were 3.7Mt in Q2, in line with our expectations.

● **Selling prices were well below expected levels.** Although Walter Energy typically sells hard coking coal at about the Australian prime

hard coking coal benchmark price, **realized prices in the current quarter were well below the Q2/11 US$325/t benchmark**.

● **U.S. Operations suffered from significant carryover tonnage at Q1 prices. Hard coking coal from the Alabama Underground Operations sold at an average price of US$236/t, versus the benchmark of US$325/t and our estimate of US$308/t. Management commented on the conference call that ~700,000 tonnes were brought forward from Q1/11, noting the benchmark price in Q1 was US$225/t. As illustrated in Exhibit 2, Walter Energy U.S. Underground Operations realized prices have historically been at or near the benchmark price; the low realized prices in the current quarter are uncharacteristic for the operations.**

● **Canadian and U.K. Operations were also weaker than expected. Metallurgical coal** (hard coking coal + PCI coal) from the Canadian and U.K. Operations **sold at US$232/t, versus our estimate of US$288/t**. We believe the variance to our estimates is likely attributable to both product mix (i.e., a higher percentage of sales were PCI coal) and due to carryover tonnage obligations.

KeyBanc Capital Markets (August 4, 2011):

WLT stated that it would issue business updates going forward if additional negative developments unfold at any of its core operations. **This is likely in response to investors' frustration at the surprisingly poor results at the Canadian mines, about which no update was given ahead of the 2Q release**. Analysts and investors were caught off-guard by the numerous and costly weather related challenges that were outlined in last night's release.

## C. **Defendant Scheller Appointed CEO/Walter Lowers Guidance**

69.    On September 12, 2011, Defendants caused to be issued a press

release announcing that Defendant Scheller had been elected by the Company's

Board of Directors to serve as Walter's CEO, replacing Defendant Leonard, stating

as follows:

> Walter Energy, Inc. (NYSE: WLT) (TSX: WLT), the world's leading
> publicly traded "pure play" producer of metallurgical coal for the
> global steel industry, announced today that it has named Walter J.
> "Walt" Scheller III chief executive officer and has elected him to its
> Board of Directors, effective immediately.
>
> Scheller, 50, was previously President - U.S. Operations, and since
> joining the Company in June 2010 he has been a key member of the
> team instrumental in accomplishing a number of milestone initiatives,
> including the acquisition of Western Coal and the addition of an
> estimated 68 million metric tons of neighboring metallurgical coal
> reserves at the Company's Alabama operations.

70. Shortly thereafter, on September 21, 2011, Defendants caused to be

issued a press release announcing "enhanced" disclosure of its 2Q11 results and

2011 second half sales expectations:

> To help investors better understand Walter Energy, the Company has
> expanded its historical statistical disclosure and reformatted it to
> better describe its current business segments and to provide
> information by product for the second quarter forward. For the third
> and fourth quarters of 2011, the Company is also providing specific
> guidance for operating income, net income and earnings per share, on
> a one-time basis.
>
> Walter Energy's consolidated operating income is expected to be
> between $125 million and $145 million for the third quarter of 2011
> and between $255 million and $295 million for the fourth quarter.
> Consolidated net income is expected to be between $63 million and
> $73 million for the third quarter and between $165 million and $185
> million for the fourth quarter of 2011. Earnings per share is expected
> to be between $1.00 and $1.16 in the third quarter and between $2.63
> and $2.95 for the fourth quarter of 2011.

\* \* \*

Walter Energy is making solid operational progress despite a slower than expected recovery from the 100-year record rainfall experienced in Northeast British Columbia during the second quarter as well as recovery from the difficult geology at Mine No. 7 in Alabama. **These events will cause a delay in the Company's anticipated growth in production and associated improvement in costs.** However we see early recovery today and expect clear improvement beginning in 2012. Longer term, Walter continues to target strong growth in metallurgical production by the end of 2013.

In the first half of 2011, Walter Energy and Western Coal sold just under 5.2 million metric tons of metallurgical coal (including pre-acquisition sales of Western in the first quarter 2011) and, even with the delayed recovery, we still anticipate a similar level of metallurgical coal sales in the second half of the year of slightly over 5.2 million metric tons. The previous metallurgical coal sales guidance for the second half of 2011 was 5.9 million metric tons.

\* \* \*

**In Alabama at Mine No. 7 we are pleased that we continue to progress through the area of difficult geology, albeit at a slower pace than first anticipated, and we have not encountered further squeeze conditions.** However, our cutting rate over the last 30 days has only averaged approximately 20 feet per day, which is less than the 35 feet per day estimate we had previously assumed. We currently expect to advance through this area and return to normal cutting rates of 45-50 feet per day by mid-October. In addition, we are simultaneously installing a new set of 1,350 ton shields in the new E panel of the mine that are 50% stronger than the current shields in operation. This new E panel of the mine is now scheduled to add production beginning in November.

In Northeast British Columbia we continue to increase production, but at a rate below our previous expectations," said Neil Winkelmann, President of Canadian and UK Operations. "The expansion of the shared wash plant facility that supports the Brule and Willow Creek mines is now scheduled to coincide with the Ridley Terminal rail-car

dumping system upgrade. Therefore, we now expect slightly less production in the second half of 2011 than in our previous forecast. **We have also experienced a slower than anticipated improvement in hauling rates along the now operational Falling Creek Connector Road.** But, we expect to see further improvement in hauling rates over the remainder of the year.

71.     Again, the market did not react kindly to the release or Mr. Scheller's comments.  The price of Walter common stock declined approximately *12%*, from $75.00 per share on September 20, 2011 to $66.25 on September 21, 2011.

Analysts again expressed concern regarding these events:

KeyBanc Report, September 21, 2011

**This morning, Walter Energy, Inc. (WLT-NYSE) issued 3Q11 EPS guidance of $1.00-$1.16, dramatically below our 3Q11 estimate of $3.20 and consensus of $3.23.** Progress resolving its Alabama mines geological issues has been much slower than expected, resulting in much higher than expected mining costs in excess of $100/MT.

We expect a negative reaction to the 3Q11 earnings shortfall, potentially exacerbated by weaker demand commentary from Alpha Natural Resources. **Specifically, the cutting rate at WLT's No. 7 Alabama mine has been just 20 feet/day over the last month, which compares to the Company's own expectations of 35 feet/day.** Total 3Q11 expected met coal shipments appear 400,000 metric tons below 2Q11's 2.7 million metric tons. Expected hard coking coal pricing realizations also look a bit lighter than our expectations. WLT's recently acquired Canadian operations also remain more execution constrained (logistics, capital upgrades, high overburden ratios) than we had expected, limiting production upside visibility over the next several quarters after several already disappointing quarters.

Accordingly, updated 2H11 met coal sales volume guidance was lowered to 5.2 million from 5.9 million. WLT also indicated 4Q11

EPS guidance of $2.63-$2.95, within our $2.80 estimate and below current consensus of $3.16; the sequential upside implies better hard coking coal production, pricing and lower cash costs across its Alabama footprint.

On the plus side, the Company appears more proactive, issuing updated operational guidance, the lack of which was a sore subject with investors last quarter. The Company will also enhance operational disclosures more in line with pre-Western reporting practices. This should play well with long-term investors, who (like us) were disappointed with the opaque reporting style chosen following the Western acquisition that made it more difficult to track performance at individual mining complexes.

BB&T Capital Markets Report, September 22, 2011

Due to production delays at both the Alabama underground and Canadian operations, Walter lowered 2H met coal shipment guidance from 5.9M to 5.2M metric tons. At Mine No. 7 in Alabama, the company had been expecting cut rates of 35 feet/day. However, recent cut rates have averaged only 20 feet/day. In Western Canada, the company cited lower than expected hauling rates along the Falling Creek Connector Road and timing issues related to the expansion of the shared wash plant facility that supports the Brule and Willow Creek Mines. WLT was optimistic with regard to these issues, with new CEO Walt Scheller expecting cut rates at Mine No. 7 to reach 45-50 feet/day by mid- October and for hauling rates to improve in Western Canada throughout the remainder of the year. Nonetheless, **the net effect of lower production is higher costs. As such, we lower our estimates for 2011. We also reduce our expectations for 2012 and 2013 to more conservatively forecast production and cost levels.**

72.    At all times during the Relevant Period, it was not true that the Company was on schedule to operate the "Connector Road" and realize the production and cost efficiency gains disclosed by Defendants.

73.   At all times during the Relevant Period, unbeknownst to investors, Defendants failed to timely and accurately disclose that Walter had committed to sell more than 706,000 tons of coal during 2Q11 at prices that were well below the 2Q11 benchmark price.

74.   At all times during the Relevant Period, unbeknownst to investors, Defendants had failed to disclose that Walter's flagship operation, Mine No. 7 was continuing to experience significant shutdowns due to substandard safety conditions, negatively impacting (i) production and (ii) worker safety; and (iii) potential legal liability; and (iv) decreased public goodwill.

75.   Throughout the Relevant Period, it was also not true that Walter had in place adequate systems of internal operational or financial controls, such that Walter's reported financial statements were true, accurate, or reliable.

76.   As a result of the foregoing, throughout the Relevant Period, it also was not true that the Company's financial statements and reports were prepared in accordance with relevant SEC rules, in particular SEC Regulation S-K.

77.   As a result of the aforementioned adverse conditions which Defendants failed to disclose, throughout the Relevant Period, Defendants lacked any reasonable basis to claim that Walter was operating according to plan, or that Walter could achieve guidance sponsored and/or endorsed by Defendants.

78.    The price of the Company's stock still has not recovered and currently trades at around $30.00 per share.

79.    Accordingly, the Company has been damaged.

## DERIVATIVE AND DEMAND ALLEGATIONS

80.    Plaintiff brings this action derivatively in the right and for the benefit of Walter to redress the breaches of fiduciary duty and other violations of law by the Defendants.  Walter is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

81.    Plaintiff will adequately and fairly represent the interests of Walter and its shareholders in enforcing and prosecuting its rights.

82.    Plaintiff is and was an owner of Walter common stock throughout the Relevant Period when Defendants' wrongful course of conduct alleged herein occurred and remains a stockholder of the Company.

83.    At the time this complaint was filed, the Board consisted of the following ten (10) individuals: defendants Tokarz, Beatty, Clark, Kolb, Kriegshauser, Leonard, Mascall, Rethore, Scheller and Wagner (the "Director Defendants").

84.    Because of their Board membership and/or executive positions with the Company, these Director Defendants had access to the undisclosed information

about Walter's improper accounting and the Company's failure to maintain effective internal controls over its accounting as required by the SEC.  The Board was on notice that the representations made by the Company about Walter's finances and business prospects were materially improper and inaccurate yet took no corrective action.

85.    The Director Defendants face a substantial likelihood of personal liability in this action, *inter alia*, (i) as a result of their failure, as directors and/or officers of Walter, to assure that a reliable system of financial controls was in place and functioning effectively; (ii) for their failure to assure that a reliable disclosure system was in place and functioning effectively; and (iii) for their violations of federal securities laws.  Moreover, the Board was on notice that critical accounting conventions and regulations were not being enforced and failed to take the necessary steps to prevent and/or remedy those deficiencies, proximately causing millions or billions of dollars in damages to the Company.

86.    Plaintiff has not made any demand on the Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

### Defendant Leonard is Not Independent

87.    Demand is excused as to defendant Leonard because Leonard recently served as Walter's interim CEO, pursuant to which he has received substantial

monetary compensation and other valuable benefits.  Based thereupon, Walter's own disclosures (including the Company's 2011 Proxy Statement filed on January 25, 2010) admit Leonard's lack of independence:

> Mr. Leonard, our Company's interim Chief Executive Officer, cannot be deemed independent under the NYSE listing standards due to his employment relationship with the Company.

88.     Accordingly, demand is excused on defendant Leonard.

## Defendant Scheller is Not Independent

89.     Demand is excused as to defendant Scheller because Scheller's principal professional occupation is his employment with Walter as its CEO, pursuant to which he received and continues to receive substantial monetary compensation and other valuable benefits.  Similar to Defendant Leonard, Walter's historical practice, based upon NYSE director independent standards, Defendant Scheller lacks independence.

90.     Accordingly, demand is excused on defendant Scheller.

## Demand is Futile for the Audit Committee Defendants

91.     During the Relevant Period defendants Clark, Kolb, Kriegshauser and Wagner served as members of the Audit Committee.  Pursuant to the Audit Committee Charter, members of the Audit Committee are charged with reviewing the Company's financial statements and internal controls. Defendants Clark, Kolb, Kriegshauser and Wagner breached their fiduciary duties of due care, loyalty, and

good faith because the Audit Committee permitted the above false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and allowed the internal control deficiencies illustrated herein to occur.

92.     Clark, Kolb, Kriegshauser and Wagner have been responsible for and/or failed to rectify Walter's ongoing disclosure and internal control issues. During this time, defendants Clark, Kolb, Kriegshauser and Wagner have permitted the aforementioned issues to persist (while personally profiting from their own misdeeds).  This situation and the actions of defendants Clark, Kolb, Kriegshauser and Wagner are so far removed from the standard of care required of any director, but particularly of an Audit Committee that demand upon them is excused.

### Demand is Futile for the Nominating and Corporate Governance Committee Defendants

93.     Defendants Beatty, Clark, Rethore and Tokarz, as members of the Nominating and Corporate Governance Committee, are responsible for the development, maintenance, and recommendation of a set of corporate governance principles and for periodically reviewing such principles.  Defendants Beatty, Clark, Rethore and Tokarz, however, failed to: (i) properly monitor and reassess the Company's corporate guidelines and governance and (ii) properly disclose the Company's governance weaknesses.  Accordingly, demand upon the Nominating and Corporate Governance Committee members is excused.

**Defendants Calder, Scheller and Leonard Face a Substantial Likelihood of Personal Liability for their Violations of Federal Securities Laws During the Relevant Period**

94.     Individually, defendants Calder, Scheller and Leonard face a substantial likelihood of personal liability for violation of the Securities Exchange Act of 1934 (the "Exchange Act") as alleged in *In re Walter Energy, Inc. Securities Litigation*, Case No. 2:12-cv-00281-VEH (the "Securities Class Action") currently pending in the United States District Court for the Northern District of Alabama, Southern Division.  Thus, defendants Calder, Scheller and Leonard face a substantial likelihood of personal liability for their actions, excusing demand.

**Defendants Tokarz, Kolb, Rethore, Leonard, Clark, Mascall and Beatty Have Interconnected Personal and Professional Relationships and Thus Cannot Independently Consider a Demand**

95.     Defendants Tokarz, Kolb, Rethore, Leonard, and Clark have served on the Board of Mueller Water Products ("Mueller") together since 2006, when Mueller was spun off by Walter in 2006. Walter is now a supplier of Mueller.

96.     Similarly, defendants Beatty and Mascall served together as directors of Western Coal prior to Western Coal's acquisition by Walter.

97.     In sum, as a result of these longstanding professional relationships among themselves, defendants Tokarz, Kolb, Rethore, Leonard, Clark, Mascall and Beatty are incapable of bringing suit against each other on behalf of the Company.

Accordingly, demand on defendants Tokarz, Kolb, Rethore, Leonard, Clark, Mascall and Beatty is futile.

### The Entire Board Faces a Substantial Likelihood of Liability for Intentional Misconduct in Relation to the August 3, 2011 Press Release

98.    The Securities Class Action contains statements from a Confidential Witness ("CW"), described therein as "Director of the Company's Communications Department from early 2005 to mid-September 2011". This CW described how the CW drafted a press release disclosing the 500,000 ton coal production shortfall and tonnage pricing agreements and thereafter emailed the same release to defendant Scheller and the entire Board. The CW claims that the Board sanitized this release to hide those two issues and thereafter issued the release as described herein above at ¶¶61-73. The full text of the CW's depiction of the events is described below:

● On or before July 10, 2011, CW-1 learned, by receiving and reviewing mine-by-mine production and financial information from Walter's Accounting Department, that Walter suffered a 2Q11 production shortfall that was approximately 500,000 tons below previous estimates for 2Q11.

● Upon learning of the approximately 500,000 ton production shortfall for 2Q11, CW-1 reviewed a press release that he prepared and Walter issued on Form 8-K on September 2, 2010, which alerted the market of an anticipated 200,000 ton production shortfall for 3Q10. Upon reviewing this prior press release, CW-1 concluded that immediate public disclosure of the far larger production shortfall for 2Q11 was required.

● On or about July 10, 2011, CW-1 contacted Defendant Scheller (President of Walter's U.S. Operations and a member of the Company's Board of Directors) via telephone and informed Defendant Scheller that Walter should publicly disclose the 2Q11 production shortfall by issuing a press release. After being provided with details on Walter's 2Q11 production results and the 500,000 ton shortfall, Defendant Scheller revealed that he was already aware of the 2Q11 production shortfall *and* that a decision not to disclose the 2Q11 production shortfall had already been made at a higher level of the Company. Accordingly, no press release was issued at that time to alert the market of the 2Q11 production shortfall.

● Shortly thereafter, CW-1 brought the known and significant 2Q11 production shortfall to the attention of the Company's recently-appointed VP of Investor Relations, Paul Blalock ("Blalock"). Like Defendant Scheller, Blalock also did not determine to disclose the 2Q11 production shortfall publicly.

● Thereafter, CW-1 drafted a press release concerning Walter's 2Q11 results that was to be issued in early August 2011. The draft press release included details about the Company's 2Q11 production shortfall due, in part, to squeeze events at Walter's mines. CW-1 then e-mailed this draft press release to Walter's Board of Directors for review and approval. Walter's Board of Directors rejected the draft press release as too negative, however, and re-drafted the press release to de-emphasize the role that the squeeze events played in the production shortfall.[2]

99.    Thus, as a result of the entire Board's "cleansing" of proper disclosure and the intentional dissemination of the false and misleading August 3, 2011 press release, demand is excused for the entire Board.

---

[2] These allegations are found in *In re Walter Energy, Inc. Securities Litigation*, Case No. 2:12-cv-00281-VEH (Dkt. No. 35) at ¶7.  Undersigned Plaintiff's Counsel has not independently confirmed these allegations and thus the quoted paragraphs are provided here based upon the attestation of the attorneys in the Securities Class Action.

100.   In sum, demand is futile as to each and every Board member because each of the Director Defendants: (i) is interested; (ii) lacks independence; (iii) faces a substantial likelihood of personal liability for their actions; or (iv) has affirmatively demonstrated their inability to act in compliance with their fiduciary duties to the Company or with ordinary business judgment, thereby excusing demand.

101.   Plaintiffs have not made a demand upon the other stockholders of Walter Energy to commence this action because such a demand would be futile for the following reasons:

      a.  Walter is a publicly held company with more than sixty million shares outstanding and thousands, if not tens of thousands of stockholders;

      b.  making a demand on such a large number of Walter stockholders would not be possible for Plaintiff who has no way of knowing the names, addresses or other contact information for stockholders;

      c.  such a demand, even should the contact information be discovered for Walter's stockholders, would incur massive and unreasonable expenses for Plaintiff.

**COUNT I**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**
**FOR DISSEMINATING FALSE AND MISLEADING INFORMATION**

102.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.   As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Walter disseminated accurate, truthful and complete information to its shareholders.

104.   Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Walter shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

105.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**COUNT II**
**AGAINST ALL DEFENDANTS FOR BREACH OF**
**FIDUCIARY DUTIES FOR FAILING TO MAINTAIN**
**INTERNAL CONTROLS**

106.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

107.   As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial

statements were prepared in accordance with GAAP and relevant SEC regulations, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

108.   Defendants willfully ignored the obvious and pervasive problems with Walter's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

109.   As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

110.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.   Defendants owed and owe Walter fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Walter the highest obligation of good faith, fair dealing, loyalty and due care.

112.   Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

113.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Walter has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

114.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

115.   Plaintiff, on behalf of Walter, has no adequate remedy at law.

## COUNT IV
### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

116.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117.   By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Walter.

118.   Plaintiff, as a shareholder and representative of Walter, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V
### AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

119.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Walter, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Walter to misrepresent material facts regarding its financial position and business prospects.

121.   As a direct and proximate result of Defendants' abuse of control, Walter has sustained significant damages.

122.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

123.   Plaintiff, on behalf of Walter, has no adequate remedy at law.

### COUNT VI
### AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

124.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

125.   Defendants had a duty to Walter and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Walter.

126.   Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Walter in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged

herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Walter's affairs and in the use and preservation of Walter's assets.

127.   During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Walter to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Walter, thus breaching their duties to the Company.   As a result, Defendants grossly mismanaged Walter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing Walter to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place

before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to Walter restitution from Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: September 27, 2012

  /s/ Tammy M. Stokes
David Donaldson (ASB-0340-O64D)
Tammy M. Stokes (ASB-6084-k69t)
DONALDSON & GUIN, LLC
505 20th St. N., Ste. 1000
Birmingham, AL  35203
(205) 226-2282 (telephone)
(205) 226-2357 (facsimile)
DavidD@dglawfirm.com
tammys@dglawfirm.com

**THE SHUMAN LAW FIRM**
Kip B. Shuman
Rusty E. Glenn
885 Arapahoe Avenue
Boulder, CO 80302
(303) 861-3003
Fax: (303) 484-4886
Email: kip@shumanlawfirm.com
Email: rusty@shumanlawfirm.com

Please serve Defendants by certified mail at the following addresses:

Keith Calder
c/o Walter Energy, Inc.
CT Corporation System
2 North Jackson Street
Suite 605
Montgomery, AL  36104

David R. Beatty
c/o Walter Energy, Inc.
CT Corporation System
2 North Jackson Street
Suite 605
Montgomery, AL 36104

Walter J. Scheller
1100 Birchall Lane
Apt. 104
Birmingham, AL 35226

Joseph B. Leonard
21253 Floral Bay Drive North
Forest Lake, MN 55025-2104

A.J. Wagner
c/o Walter Energy, Inc.
CT Corporation System
2 North Jackson Street
Suite 605
Montgomery, AL 36104

Jerry W. Kolb
c/o Walter Energy, Inc.
CT Corporation System
2 North Jackson Street
Suite 605
Montgomery, AL 36104

Walter Energy, Inc.
CT Corporation System
2 North Jackson Street
Suite 605
Montgomery, AL 36104

Howard L. Clark, Jr.
c/o Walter Energy, Inc.
CT Corporation System
2 North Jackson Street
Suite 605
Montgomery, AL 36104

Patrick Kriegshauser
c/o Walter Energy, Inc.
CT Corporation System
2 North Jackson Street
Suite 605
Montgomery, AL 36104

Bernard G. Methore
c/o Walter Energy, Inc.
CT Corporation System
2 North Jackson Street
Suite 605
Montgomery, AL 36104

Graham Mascall
c/o Walter Energy, Inc.
CT Corporation System
2 North Jackson Street
Suite 605
Montgomery, AL 36104

Michael T. Tokarz
c/o Walter Energy, Inc.
CT Corporation System
2 North Jackson Street
Suite 605
Montgomery, AL 36104

**WALTER ENERGY VERIFICATION**

I, Dean Sinerius, hereby verify under the penalty of perjury that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: 9/19/12

Dean Sinerius